IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. DEMOCRUS PERNELL BURSTON, Defendant. | No. CR12-0042 REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I.   INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. RELEVANT FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A. Building  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B. Drug Dog Sniff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     C. Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     D. Interview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.  DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.   Dog Sniff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          1.   Curtilage . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          2.   Implicit License . . . . . . . . . . . . . . . . . . . . . 9
     B.   Franks Violation . . . . . . . . . . . . . . . . . . . . . . . . 10
     C.   Good Faith Exception to Exclusionary Rule  . . . . . . . . . . . . . . . 13

V.   REPORT AND RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . 15

## I. INTRODUCTION

On the 13th day of June 2014, this matter came on for hearing on the Motion to Suppress (docket number 20), filed by the Defendant on June 2, 2014. The Government

was represented by Assistant United States Attorney Anthony Morfitt. Defendant Democrus Pernell Burston appeared in person and was represented by his attorney, Raphael M. Scheetz.

## II. PROCEDURAL HISTORY

On June 5, 2012, Defendant Democrus Pernell Burston was charged by Indictment with being a prohibited person in possession of firearms. Defendant appeared on April 30, 2014 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on June 30, 2014.

On June 2, 2014, Defendant timely filed the instant motion to suppress. The Government filed its resistance on June 9. With the Court's permission, Defendant filed a supplemental brief on June 23. Because of the pending motion, the trial was continued to August 25.

## III. RELEVANT FACTS

On March 13, 2012, Officer John O'Brien of the Cedar Rapids Police Department obtained information from a third party regarding potential drug use in apartment number 4 at 2050 Northtowne Court N.E., Cedar Rapids.[1] It was learned that Jamia Peeples lived there with her child and Democrus Burston. O'Brien shared that information with Officer Al Fear of the K-9 division of the Cedar Rapids Police Department. That same day, Fear visited the apartment building with his drug dog, Marco, who positively indicated a presence of drugs. Fear then applied for a search warrant, citing Marco's alert at apartment 4 and Burston's criminal record. A state judicial magistrate issued a search warrant (Government's Exhibit 2). On March 19, 2012, O'Brien and Fear, along with the Cedar Rapids Special Response Team and other officers, executed the search warrant. Officers found four rifles, ammunition, and marijuana residue. Burston was taken into custody.

---

[1] Officer O'Brien is currently assigned to the FBI Safe Streets Task Force.

### A. *Building*

Burston was living in apartment number 4 of a two-story, eight-unit, apartment building. Each unit has an exterior door, and the doors to apartments 2, 4, 6, and 8 face west. The apartments are numbered from south to north with apartments 6 and 8 north of apartment 4. Apartment doors 2 and 4 are adjacent to one another, separated by mailboxes. There is a walkway between buildings that branches off and leads up to the apartments. Apartments 2 and 4 share a common sidewalk that expands into a landing for both doors. Approximately six feet to the north of the door to apartment 4 is a window for apartment 4. In front of the window is a bush, but Officer Fear testified that the bush did not span the entire width of the window at the time of the dog sniff. Both parties introduced photographs depicting the scene (Government's Exhibit 1 and Defendant's Exhibits A, B, and C), but the photographs were taken only recently.[2]

### B. *Drug Dog Sniff*

Officer Fear testified that he conducted an "open air sniff" with his K-9 partner "Marco" on March 13, 2012. Because of the prevailing wind, Fear led Marco to the north side of the building, closer to apartments 6 and 8, and then released Marco to sniff off-leash. According to Fear, because he knew the "target" apartment, he wanted Marco off-leash to take himself out of the equation. Fear testified that Marco sniffed the air alongside the front wall of the building until he got closer to apartment 4, when he indicated a change in behavior. Marco began to breathe heavier and sniff more intently. Marco is trained to seek out the strongest source of odor and then alert by sitting down and waiting for a reward. Marco alerted on the south side of the open window to apartment 4, past the bush in front of the window, but still north of the door by approximately two feet. Marco

---

[2] Officer Fear testified that he believed photographs were likely taken when the search was executed on March 19, 2012, but those photos were not offered into evidence.

was in the grass approximately 6-10 inches from the window when he alerted. Officer Fear remained approximately six feet from the building at all times.

## C. Warrant

After the positive alert for drugs from Marco, Officer Fear applied for a search warrant. In that application, Fear wrote:

> On 03-13-2012 at approximately 1330 hours, I walked my narcotics K9 partner, Marco, throughout the complex in the area of building 2050. As Marco sniffed the various door bottoms of all the apartments, Marco showed a change in behavior as he approached apartment #4. As Marco started to sniff the window area of apartment #4, Marco showed a positive alert on apartment #4 for the presence of a controlled substance.

Government's Exhibit 2, page 6 (original all caps).

Fear also wrote:

> The resident of 2050 Northtowne Court Northeast Apartment #4 is Democrus Burston DOB 11-26-1974. Burston has a lengthy criminal history including: marijuana possession in 1995, possession and manufacture of marijuana 2004. Burston has other charges relating to robbery, possession of a firearm, assault on officers.

Government's Exhibit 2, page 6 (original all caps).

According to his Criminal History Record, Burston was charged in 1995 with possession of marijuana, but the charge was dismissed.[3] Officer Fear testified that he failed to notice that the charge was dismissed because that information was on the next page. In 2004, Burston was charged with possession of marijuana of less than one ounce, not possession and manufacture of marijuana.[4] The Criminal History Record identifies the "charge literal" as "manufacture/sell/dispense/distribute," but then identifies the

---

[3] Government's Exhibit 3 at 6-7.

[4] *Id.* at 12.

4

"charge description" as "Poss Marijuana less 1OZ."[5] Fear testified that he assumed the charge was a manufacturing charge in addition to possession because according to the Criminal History Record, the "severity" of the charge was a "felony." Fear testified that the incorrect information in the warrant application was a result of his oversight in reading Burston's Criminal History Record, and that he was not intending to mislead the judicial magistrate.

### D. Interview

According to Officer O'Brien, Burston was read his *Miranda* warnings by Officer Fear during the execution of the warrant. Fear testified, however, he could not recall talking to Burston and does not recall reading Burston a *Miranda* warning. Approximately forty-five minutes after the initial entry into Burston's apartment, Burston was arrested and transported to the Cedar Rapids Police Station, where he was read his *Miranda* warnings by O'Brien. According to O'Brien, Burston indicated he understood his rights and was willing to talk, but he refused to sign a form indicating such. In the interview, which lasted about 15 minutes, Burston told O'Brien that his neighbor had brought the guns to him for safekeeping because the sheriff was coming to his neighbor's apartment. Burston also admitted that he had smoked marijuana the prior evening, but denied selling marijuana.

## IV. DISCUSSION

### A. Dog Sniff

Burston argues that the open air sniff conducted by Officer Fear and Marco constituted an illegal search. In support of his argument, Burston relies heavily on *Florida v. Jardines*, \_\_\_\_ U.S. \_\_\_\_, 133 S. Ct. 1408 (2013). The Supreme Court in *Jardines* held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Id.*

---

[5] *Id.*

5

at 1417-18. In that case, police officers used a drug dog to investigate a tip that marijuana was being grown in the Jardines' single family home. Officers allowed a trained drug dog to sniff for drugs on the front porch. Following a positive indication for drugs, officers sought and obtained a search warrant for the house. The defendant filed a motion to suppress, arguing the dog sniff was an unconstitutional warrantless search.

The *Jardines* Court first focused on whether the area of the sniff was curtilage. Finding that a front porch is the "classic exemplar of curtilage," the Court then analyzed whether the officers and the drug dog occupied the curtilage as an unlicensed intrusion while conducting the dog sniff. *Id.* at 1415. Because the area where the officers occupied was part of the home's curtilage and there was no implicit license for police to conduct a search on the front porch, the Court held that the sniff constituted an unlawful warrantless search under the Fourth Amendment. With these general principles in mind, I turn to the facts in this case.

### 1. Curtilage

Here, Marco never reached Burston's front door, but instead sniffed along the front of the apartment building, stopping when he smelled drugs coming from the apartment's open window. Fourth Amendment protection extends to houses and the areas "immediately surrounding and associated with the home," called curtilage, but does not extend to open fields. *Id.* at 1414 (citing *Hester v. United States*, 265 U.S. 57, 59 (1924), and *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Curtilage extends the boundaries of the home, because a person's Fourth Amendment rights "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity." *Id.* However, *Jardines* does not provide an analysis of what constitutes curtilage, concluding instead that curtilage is "easily understood from our daily experience." *Id.* at 1415 (citing *Oliver*, 466 U.S. at 182). For reasons detailed below, I believe the area where Marco sniffed in this case more closely aligns with a front porch or side garden than an open field, and constitutes protected curtilage of Burston's home.

6

The Supreme Court in *United States v. Dunn*, 480 U.S. 294, 301 (1987), identified four factors in determining curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." These factors combined do not produce a "finely tuned formula," but instead are "useful analytical tools" in determining "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 1140.

Here, the area where Marco sniffed is approximately six inches from the apartment. However, there is no "enclosure" surrounding the area, preventing access to where Marco sniffed. Moreover, the layout of the area does not imply that it was routinely used for any of the private uses of a home.[6] Finally, there is nothing that prevents people from passing by and "observing" the area.

While the proximity of the home is the only factor in favor of curtilage, I believe it strongly supports a finding that the lawn in front of the apartment window is curtilage. Six inches from a home can hardly be classified as an open field, and instead more closely aligns with a space that is "immediately surrounding" the home. *Oliver*, 466 U.S. at 180. While someone might cut across the apartment's front lawn or play in the yard, they would certainly not do so this close to Burston's apartment. I believe it is unnecessary to decide whether the Fourth Amendment's protection of curtilage extends all the way to the street. Despite only one *Dunn* factor pointing towards a finding a curtilage, I believe the area six inches from Burston's apartment window is curtilage.

---

[6] Photos presented into evidence by both the Defendant and the Government show a grill in between the door and the space where Marco indicated. However, these photos were taken recently, and neither of the officers who testified could remember if there was a grill at the time of the dog sniff or the search. Officer Fear remembers that there was nothing impeding Marco from sniffing where he did, indicating that the grill was likely absent at the time of the dog sniff.

I have not disregarded the fact that this was an apartment building, and not a single-family residence. *United States v. Mathews*, 2013 WL 5781566 (D. Minn. Oct. 25, 2013) ("Eighth Circuit courts, both before and after *Jardines*, have held that an apartment common area or hallway is not part of curtilage, and thus does not receive the same Fourth Amendment protection."). Before *Jardines*, the Eighth Circuit ruled in *United States v. Brooks*, 645 F.3d 971, 975-76 (8th Cir. 2011), that the common backyard and staircase in an apartment building was not curtilage. Similarly, in *United States v. Scott*, 610 F.3d 1009, 1015 (8th Cir. 2010), the Court held that a dog sniff in the interior common hallway of an apartment building was not a search for Fourth Amendment purposes. In both *Brooks* and *Scott*, all of the residents had access to the common spaces in question, so the defendants had no reasonable expectation of privacy. The defendants in those cases would not have been able to use the backyard, the staircase, or the hallway as an extension of their home, because they did not have exclusive control over those areas.

However, there are several distinguishing factors between the common areas in an apartment building like those in *Brooks* and *Scott*, and the area where Marco sniffed. First, common hallways, staircases, and backyards have an expectation of others being present there, while the area where Marco sniffed did not. The layout of Burston's apartment building does not suggest that the grassy area in front of Burston's window is a common area. Each apartment in Burston's apartment building has its own door and an exterior window, much like a townhouse or row house. Unlike a common backyard, it is easy to distinguish which grassy areas are directly in front of each apartment, creating the impression that each apartment has its "own" front yard. While it would be common to see residents and guests occupying any space within a communal backyard, Burston could reasonably expect that others would not occupy the grassy area directly in front of his apartment door and window. While it may be unclear where the exact delineation in the grass between one apartment and the next would be, certainly the areas as close as six inches from Burston's window would be an area that Burston would not expect others to

8

occupy. Even if the area where Marco sniffed is classified by the apartment building owners as a common area where any resident has a right to be, social norms would likely preclude other residents from occupying the area where Marco sniffed without permission from Burston. While it is unclear whether or not there was a grill at the time of the sniff, current pictures of the apartment show a grill occupying the space between the door and the window, indicating that Burston could have exclusive control over that area and use it for his own purposes, unlike a common backyard or hallway.

The proximity of the area where Marco sniffed to Burston's home, and the reasonable expectation of privacy and exclusive control over the area where Marco sniffed, both indicate that the area constitutes curtilage and is entitled to Fourth Amendment protection.

### 2. *Implicit License*

After determining that the area where the dog sniff occurred in *Jardines* was curtilage, the Court next addressed whether the police officers' investigation "was accomplished through an unlicensed physical intrusion." *Jardines*, 133 S. Ct. at 1415. The Court noted that the license can be explicit, like direct permission from the owner, or implicit, reflecting the customary invitation to knock on one's front door. *Id.* ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."). *Jardines* states that despite the implicit license that allows visitors to knock on one's front door, "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*." *Id.* at 1416 (emphasis in original).

In *Jardines*, the officers and drug dog occupied space on the front porch, an area where — absent the intent of a search — officers would have an implicit license to knock on the door and wait a reasonable time for a response. In our case, even absent the intent to search, police officers would not have an implicit license to stand six inches from the

window in front of Burston's apartment. There is no "background social norm" that allows anyone, whether casual visitor, mail carrier, or Girl Scout, to occupy the space so close to Burston's apartment window. *Jardines* suggests that spotting a visitor "exploring the front path with a metal detector or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to — well, call the police." *Id.* at 1416. If a visitor with a metal detector in the front yard is an unlicensed physical intrusion, certainly a police officer with a drug dog positioned six inches from a front window is an unlicensed physical intrusion. Because the area where Marco sniffed is curtilage and because there was no license, explicit or implicit, for Marco to occupy the area where he sniffed, the dog sniff constitutes an unlawful warrantless search under the Fourth Amendment.

## B. Franks Violation

Burston also argues that material misstatements or omissions in the search warrant application serve to invalidate the warrant. In *Franks v. Delaware*, 438 U.S. 154 (1978), the Court held that if a defendant establishes by a preponderance of the evidence that a sworn statement used by police to procure a search warrant contained perjury or a reckless disregard for the truth, then the court must determine whether the affidavit's remaining content is sufficient to establish probable cause. If not, then "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking in the face of the affidavit." *Id.* at 156. Burston claims three misstatements of facts were made in the warrant application constituting a *Franks* violation: two different statements regarding Burston's criminal history and Officer Fear's description of the dog sniff at Burston's apartment.

To prove a *Franks* violation, a defendant must first show that "the affiant officer knowingly and intentionally, or with reckless disregard for the truth, included a false or misleading statement in, or omitted information from, the affidavit in support of the warrant." *United States v. Cowling*, 648 F.3d 690, 695 (8th Cir. 2011) "Allegations of

10

negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171. Second, the defendant must prove that "the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented." *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010). It should be noted that if the defendant proves a *Franks* violation occurred, then the *Leon* good faith exception to the exclusionary rule does not apply. *Cowling*, 648 F.3d at 695 n.4.

Burston alleges that three false statements were made on the warrant application by Officer Fear. First, Fear included on the warrant application a 1995 marijuana possession charge that had been dismissed.[7] Fear testified that he failed to see that the charge had been dismissed because that information was on the next page.[8] Fear admits that it was an oversight on his part, but contends that he was not intending to mislead the judicial magistrate. Second, Fear incorrectly cited a 2004 charge as possession and manufacture, when the charge was solely for possession.[9] Fear testified that he believed he was correct in listing the charge as possession and manufacture at the time he filled out the warrant application. According to Fear, since the charge was a felony, he assumed it was for possession and manufacture. Again, Fear testified that he was not intending to mislead the judicial magistrate. Burston has not demonstrated that Fear made these false statements deliberately or recklessly; at most, Fear negligently transposed information from the criminal history report to the warrant application. Fear's false statements on the warrant application do not rise to the level of a deliberately misleading statement or a reckless disregard for the truth, and do not constitute a *Franks* violation. Moreover, I do not believe that Fear's statements as to Burston's criminal history were necessary to find probable cause.

---

[7] Government's Exhibit 2 at 6.

[8] *See* Government's Exhibit 3 at 6-7.

[9] Government's Exhibit 2 at 6; Government's Exhibit 3 at 12.

The third false statement made on the warrant application deals with Officer Fear's description of the dog sniff. Fear wrote in his application that "[a]s Marco sniffed the various door bottoms of all the apartments, Marco showed a change in behavior as he approached apartment #4."[10] Burston notes that Marco did not sniff the door bottoms of *all* the apartments, but only apartment numbers 6 and 8. At the hearing, Fear explained that he meant Marco sniffed all the doors up until the point where he indicated the presence of drugs. Burston also contends that this statement is a false implication that Marco indicated on Burston's apartment door. However, later in the warrant application, Fear stated "[a]s Marco started to sniff the window area of apartment #4, Marco showed a positive alert on apartment #4 for the presence of a controlled substance."[11] While Fear's statements regarding the dog sniff could arguably be interpreted differently than intended, they do not rise to the level of recklessness or deliberate falsehood that a *Franks* violation requires.

To prevail on his *Franks* claim, Burston must first prove that Officer Fear "knowingly and intentionally, or with reckless disregard for the truth, included a false or misleading statement in, or omitted information from, the affidavit in support of the warrant." *Cowling*, 648 F.3d at 695. Burston has not met his burden of proving that Fear's affidavit misstatements were intentionally or recklessly false. Burston must also prove that "the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented." *Mashek*, 606 F.3d at 928. Even if the Court disregards all allegedly false statements made in the warrant application, Marco's indication of drugs was enough to establish probable cause (if the dog sniff was otherwise lawful). Accordingly, *Franks* affords Burston no relief.

---

[10] Government's Exhibit 2 at 6 (original in all caps).

[11] *Id.*

## C. Good Faith Exception to Exclusionary Rule

The Government concedes that if information regarding the dog sniff is removed from the search warrant application, then it lacks probable cause. The Government argues, however, that the good faith exception found in *United States v. Leon*, 468 U.S. 897 (1984), is applicable here. *Leon* held that disputed evidence will be admitted if it was objectively reasonable for the officer executing the search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant. *Id.* at 922. The Government may not rely on the good faith exception, however, if one of four circumstances are present.

> (1) [W]hen the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official beliefs in its existence entirely unreasonable;" and (4) when the warrant is "so facially deficient" that the executing officer could not reasonably presume the warrant to be valid.

*United States v. Grant*, 490 F.3d 627, 632-33 (2007) (citing *Leon*, 468 U.S. at 923).

In his supplemental brief, Burston asserts generally that *Leon* does not apply because the execution of the search warrant was "fruit of the poisonous tree." Burston did not specify which of the four enumerated circumstances he believes discredits the good faith exception. Based on his assertion of a *Franks* violation and the unlawful dog sniff, however, I assume he is relying on the first and third circumstances identified in *Grant*.[12]

---

[12] The Court believes that the second and fourth circumstances are clearly inapplicable. There is no assertion by Burston or evidence in the record that the judicial magistrate "wholly abandoned his judicial role" in issuing the search warrant, or the warrant was "so facially deficient" that Officer Fear and other officers executing the warrant would believe the warrant was not valid. *Grant*, 490 F.3d at 632.

13

Turning to the first circumstance, Burston has to show that "the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge." *Id.* I have already concluded in considering Burston's *Franks* argument that the misstatements made on the affidavit regarding Burston's criminal history and the procedure of the dog sniff were not made knowingly, intentionally, or with reckless disregard for the truth.

Burston also apparently argues that Officer Fear should have known the dog sniff was unlawful and, therefore, the warrant was "so lacking in indicia of probable cause as to render official beliefs in its existence entirely unreasonable" — the third circumstance described in *Grant*. I disagree. Officer Fear relied on binding appellate precedent in conducting his dog sniff. In *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419 (2011), the Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id.* at 2423-24. The purpose of the exclusionary rule is to "deter future Fourth Amendment violations." When officers reasonably rely on binding appellate precedent, they are not knowingly violating the Fourth Amendment and excluding the evidence would not have any deterrent value. *Id.* at 2426.

When Officer Fear and Marco conducted the dog sniff in this case, *Jardines* had yet to be decided in the Supreme Court. *United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010), and *United States v. Brooks*, 645 F.3d 971 (8th Cir. 2011), were binding appellate precedent at the time of the dog sniff. *Scott* held that having a trained drug dog sniff an interior apartment door was not a search for Fourth Amendment purposes. *Scott*, 610 F.3d at 1016. *Brooks* held that a common backyard and staircase in an apartment building are not curtilage, but rather an "open field" subject to searches without a warrant. *Brooks*, 645 F.3d at 975. I believe *Scott* and *Brooks* are still good law. Prior to *Jardines*, reliance on these two precedents would have allowed a reasonable officer to conduct the open air

14

sniff in the manner utilized by Fear. Because Fear acted in a way which a reasonable officer could believe was allowed under binding circuit precedent, the "third circumstance" in *Grant* is not met.

Accordingly, because Burston has not proved any of four excluding circumstances are present, the good faith exception to the exclusionary rule found in *Leon* applies. The evidence from the dog sniff and subsequent search and interview should not be suppressed.

## V. REPORT AND RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 20) be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on June 13, 2014.*

DATED this 10th day of July, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA